UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CALVIN HUBER and RICHARD
ZALUCHA,

        Plaintiffs,

                                    Case Number 06-14564-BC
v.                                       Honorable Thomas L. Ludington

CROP PRODUCTION SERVICES, INC.,
AGRIUM, INC., AGRIUM U.S., INC,
AGRIUM INTERNATIONAL, and LOUIS
HERMAN,

        Defendants.
_____ /

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

On May 16, 2007, Crop Production Services ("CPS"), along with all other defendants (collectively "Defendants"), filed a motion to dismiss contending that Plaintiffs Calvin Huber ("Huber") and Richard Zalucha ("Zalucha") (collectively "Plaintiffs") failed to state any claim for relief. Plaintiffs' complaint alleges that Defendants committed fraud, conversion, and civil conspiracy. Plaintiffs' claims arose from Defendants' delivery of agricultural fertilizer to Plaintiffs between approximately 1999 and 2002. On August 20, 2007, the Court held a hearing on Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

The primary thrust of Defendants' motion to dismiss is that all of the events Plaintiffs complain of culminated in individual contractual arrangements. Thus, Defendants argue the economic loss doctrine bars separate causes of action for fraud and conversion where the parties

unquestionably entered into a contract and the same alleged events constitute breaches of that contract.

## I.

CPS, sells agricultural products to farmers throughout the Midwest. In their complaint, Plaintiffs allege that CPS engaged in a scheme of systematic fraud on its customers. Specifically, employees at CPS's Linwood, Michigan facility allegedly defrauded more than 400 agricultural customers by intentionally supplying a lower grade of fertilizer than identified in the invoice materials.

Plaintiffs originally brought this action in the Circuit Court in Midland County. By stipulation the parties agreed to transfer venue to the Circuit Court of Bay County. Defendants then removed the action to federal court pursuant to 28 U.S.C. § 1441, and the Court has diversity jurisdiction. 28 U.S.C. § 1332. After removal to this Court, Defendants moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

Soon after Defendants filed their motion to dismiss, Plaintiffs moved to certify their claims as a class action pursuant to Federal Rule of Civil Procedure 23. Plaintiffs proposed certification of two plaintiff classes: dry fertilizer customers, represented by Plaintiff Huber, and liquid fertilizer customers, represented by Plaintiff Zalucha. The Court adjourned Plaintiffs' motion to certify, preferring, in the first instance, to resolve Defendants' legal challenge to Plaintiffs' alleged rights of action.

CPS is a wholly owned subsidiary of Agrium U.S., Inc. ("Agrium"), which is wholly owned by Agrium, Inc., a publicly traded company in Canada. CPS sells a variety of fertilizer products for commercial farming, including custom blended fertilizer for individual customers and ordinary

packaged fertilizer. To alter the quality or character of custom fertilizer, CPS modified the mineral composition–a mixture of nitrogen, phosphorus, potassium, and sulfur–depending on the intended specific use. In turn, the higher the mineral composition of the individual blend, the more expensive the product. To ensure that customers properly receive the specified custom blended fertilizer, Michigan law requires that all individually blended fertilizer be accompanied by an invoice indicating the levels of minerals contained therein. *See* Mich. Comp. Laws § 324.8502 (2006).[1]

The manner in which CPS transacted business with its customers varied widely. According to the CPS Michigan operation manager, CPS sold more then 50 types of fertilizer, both liquid and dry applications. Roughly sixty percent of CPS's customers purchased fertilizer after CPS representatives performed soil testing analysis and eighty-five to ninety percent of CPS's customers purchased an individually blended fertilizer mixture. CPS representatives provided soil analysis upon request, made recommendations, and negotiated individual prices with its customers. Some customers requested detailed advice and assistance prior to purchasing, while others simply contacted CPS and requested fertilizer "that works on corn." Additionally, some customers had a prepaid, standing order, while others negotiated each delivery. At this point in the development of the case, Plaintiffs do not know the amount of the 400 allegedly defrauded customers that purchased soil analysis or related specialized services from CPS prior to purchasing blended fertilizer.

In each of the transactions, the customer received an invoice reflecting the specific blended fertilizer, its price, and the delivery date. When the fertilizer was delivered, customers also received

---

[1] Section 324.8502 states "[a] custom blend shall be accompanied by a written or printed invoice or statement to be furnished to the purchaser at the time of delivery containing in clearly legible and conspicuous form the following information . . . (d) Either the net weight and guaranteed analysis of the custom blend or the guaranteed analysis and net weight of each material used in the formulation of the custom blend or both." Mich. Comp. Law § 324.8502(3)(d) (2006).

a ticket to confirm delivery.

Huber and Zalucha,[2] both farmers, each purchased individually blended fertilizer for commercial agricultural use. Huber purchased dry blended fertilizer and Zalucha purchased blended liquid fertilizer. According to Plaintiffs' representations at the motion hearing, Huber hired CPS to conduct soil testing and sampling of his fields prior to purchasing a custom blend of dry fertilizer. It was further represented that Zalucha did not purchase any testing or sampling from CPS prior to contracting with CPS. As such, there are two groups of allegedly defrauded customers: 1) customers that purchased and relied on soil analysis and other services from CPS that induced them to purchase a certain quality of fertilizer and 2) customers that merely purchased a custom blended fertilizer without any soil analysis or other services from CPS prior to contracting.

Plaintiffs allege that CPS furnished a fertilizer containing an elevated mineral composition, yet knowingly intended to deliver fertilizer with diminished mineral levels. According to Plaintiffs' representations at the motion hearing, CPS's Michigan general manager, co-defendant Lewis Herman ("Herman"), obtained a low quality, liquid fertilizer used as an industrial cleanser from a Port Huron, Michigan company ("Port Huron mixture"). CPS added this Port Huron mixture to its liquid fertilizer product in order to reduce its expense of producing the product. Despite the fertilizer's diminished mineral levels, CPS still labeled its product as a higher quality. Plaintiffs emphasize that Defendants' practice of mislabeling the contents of the fertilizer violates Michigan law. Plaintiffs believe that Herman either directed or knew of the mislabeling and that he received additional bonus pay as a result of the increased sales.

---

[2] Notably, Zalucha stopped farming in 2001 and began working for CPS as a handyman. According to Defendants, Zalucha resigned from CPS in 2004 because he felt unfairly treated.

These allegations came to light when a former CPS employee, Catherine Rowell ("Rowell"), reported to the police that CPS sold mislabeled, diluted fertilizer to its customers. Rowell asserted that she discovered the alleged fraud when she determined that CPS records indicated that it had three additional "tankers" of high grade fertilizer. As a result of Rowell's disclosures, the Michigan State Police initiated a criminal investigation. On or about April 1, 2002, the state police executed a search warrant to investigate the alleged fraud. The state filed charges against Agrium and three CPS employees, which all were subsequently dismissed. The parties have not indicated the reason for the dismissal of the criminal charges.

The Court heard oral arguments on Defendants' motion to dismiss and continued Plaintiffs' motion to certify a class action, pending its attention to Defendants' motion.

## II.

Motions to dismiss are governed by Rule 12(b) of the Federal Rules of Civil Procedure and allow for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). When deciding a motion under that Rule, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). "In practice, 'a . . . complaint must contain either direct or inferential allegations respecting all the

material elements to sustain a recovery under some viable legal theory.'" *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)). *See also Ana Leon T. v. Federal Reserve Bank*, 823 F.2d 928, 930 (6th Cir. 1987) (per curiam) (mere conclusions are not afforded liberal Rule 12(b)(6) review), *cert. denied*, 484 U.S. 945 (1987).

III.

As earlier noted, subject matter jurisdiction in this case is grounded on the diversity of the parties' citizenship. 28 U.S.C. § 1332 (2005). As a result, a federal court is to apply state substantive law when deciding an action based on diversity. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). Defendants assert that the economic loss doctrine bars Plaintiffs from asserting tort causes of action arising from their contractual agreement with Defendants. Thus, the Court must look to Michigan common law and determine whether the economic loss doctrine, as adopted by Michigan courts, is a bar to Plaintiffs' tort claims.

The economic loss doctrine seeks to stake out a dividing line between causes of action arising in contract from those arising in tort. The doctrine does not easily afford explication, in no small measure, because the two areas of law have not developed independently. Peter Birks, *The Concept of a Civil Wrong, in* PHILOSOPHICAL FOUNDATIONS OF TORT LAW 29 (David G. Owen ed., 1997). While the jurisprudence that underlies the doctrine may be esoteric, contemporary resort to the doctrine usually arises from defendants' pragmatic effort to use the doctrine to limit plaintiffs' damages. Alternatively, the doctrine surfaces as a means of favorably characterizing a cause of action into a category with a shorter statute of limitations. The doctrine is largely grounded on the notion, well-established in English law by *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145

(1854) and adopted into American law, that parties to a consensual undertaking, a contract, should be presumed to have considered and addressed potential breaches of contract and associated damages.

The contemporary expression of the economic loss doctrine "provides that [w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic losses." *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 615 (Mich. 1992) (citations and internal quotations omitted). The economic loss doctrine has "firm roots in Michigan jurisprudence." *Huron Tool and Eng'g Co. v. Precision Consulting Serv., Inc.*, 532 N.W.2d 541, 543 (Mich. Ct. App. 1995). Michigan courts have developed "a considerable body of law" on the doctrine. *Neibarger*, 486 N.W. 2d at 615. The Michigan Court of Appeals first applied the doctrine to bar a negligence claim "where the foundation of the relationship between parties is contractual and [there is] no personal injury or damage to property other than the subject goods themselves." *McGhee v. GMC Truck and Coach Division*, 296 N.W.2d 286, 291 (Mich. Ct. App. 1980); *see also Great American Ins. Co. v. Paty's, Inc.*, 397 N.W.2d 853 (Mich. Ct. App. 1986) (affirming summary disposition of the plaintiff's negligence claim on economic loss doctrine grounds); *see also Rust-Pruf Corp. v. Ford Motor Co.*, 431 N.W.2d 245 (Mich. Ct. App. 1988) (affirming summary disposition of the plaintiff's products liability claim as barred by the economic loss doctrine).

The Michigan Supreme Court explicitly adopted the economic loss doctrine to bar a negligence claim that "arise[s] from a commercial transaction in goods" when the plaintiff's injury is solely economic. *Neibarger*, 486 N.W.2d at 615. The court recognized that Michigan adopted the Uniform Commercial Code ("UCC") to govern "transactions in goods," including warranties and

other remedies. *Id.* The economic loss doctrine "hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual customers who are injured in a manner which has traditionally been remedied by resort to the law of torts." *Id.* This distinction comes from the idea that "tort principles, such as negligence, are better suited for resolving claims involving unanticipated physical injury . . . [c]ontract principles, on the other hand are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement." *Id.* (citation omitted) (internal quotations omitted). The court recognized that the source of tort remedies for products liability flows from a legal duty or policy considerations concerned with shifting the allocation of risk. *Id.* at 616. Finally, the court reasoned that adoption of the doctrine is consistent with the UCC because rejecting the doctrine "would, in effect, create a remedy not contemplated by the legislature when it adopted the UCC . . ." *Id.* at 619.

The Michigan Court of Appeals extended the economic loss doctrine to bar a claim of fraud concerning the nature or quality of goods. *Huron Tool*, 532 N.W.2d at 543. In *Huron Tool*, the court expressed the concern that allowing tort claims to be involved in a dispute governed by the UCC may cause contract law "to drown in a sea of tort," while recognizing that "the emerging trend" is to allow some narrow exceptions to the economic loss doctrine. *Id.* at 543-44. The court applied the economic loss doctrine to bar claims of fraud concerning representations of the "quality or character of the goods," as such fraud "exists only where fraud and breach of contract claims are factually indistinguishable." *Id.* at 545.

The court carved out an exception to the doctrine, however, for fraud in the inducement. This claim permits redress of misrepresentations that induce the buyer to enter into a contract but that do not in themselves constitute contract or warranty terms subsequently breached by the seller." *Id.* at 545. "Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely–which normally would constitute grounds for invoking the economic loss doctrine–but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Id.* at 545.

In distinguishing fraud in the inducement from fraud intertwined in the contract, the *Huron Tool* court relied on the reasoning in a decision from the District of New Jersey in *Public Service Enterprise Group v. Philadelphia Electric Co.*, 722 F. Supp. 184 (D.N.J. 1989). *Id.* In *Public Service*, the terms of the contract held the defendants responsible for the operation and maintenance of a power plant. *Public Service*, 722 F.Supp. at 188. The plaintiffs brought suit under both contract and tort theories alleging that the defendant's supervision led to the deterioration and closure of the plant. *Id.* at 187. The court granted the defendant's motion to dismiss as to the tort claims applying the economic loss doctrine and reasoned as follows:

"Here, [the defendant] says, the plaintiffs' fraud claims (to the extent [the defendant] understands them, see, infra ) are based solely upon misrepresentations and concealments of facts by [the defendant] with respect to operations at the [the defendant's] plant; that is, fraudulent statements relating to [the defendant's] performance of the Owners Agreement. Such fraud is not extraneous to the contractual dispute among the parties, but is instead but another thread in the fabric of plaintiffs' contract claim. Like the plaintiffs' other tort claims, its fraud claim is undergirded by factual allegations identical to those supporting their breach of contract counts. (citation omitted). This fraud did not induce the plaintiffs to enter into the original agreement nor did it induce them to enter into additional undertakings. It did not cause harm to the plaintiffs distinct from those caused by the breach of contract; and the mere fact that disclosure of certain facts to plaintiffs earlier may have allowed them to take corrective action does not change the result. If a plaintiff knew, for example, that he was being supplied with unsuitable goods he

could act to obtain other goods and therefore avoid any harm from the supplier's breach. However, in just this type of situation courts have held that a tort remedy does not exist."

*Id.* at 201. Thus, the key inquiry is whether the misrepresentation is "but another thread of fabric" in the contract claim or an "extraneous" misrepresentation that actually induced the party to execute the contract. *Id.*

Here, the bulk of Plaintiffs' claims fall squarely within the economic loss doctrine because their allegations go directly to the quality and character of the fertilizer as delivered. Plaintiffs allege that Defendants knowingly and intentionally misrepresented the amount of nutrients in the fertilizer. Assuming that Plaintiffs' allegations are true, Plaintiffs were free to negotiate warranties to protect themselves from a deficient blend of fertilizer. Plaintiffs' claims that they received a fertilizer, which was fraudulently misrepresented as of a higher quality, is indistinguishable from a claim for breach under contract law. Indeed, Plaintiffs acknowledge in their response that the challenged misrepresentations go to the quality or character of the goods. *Pl. Res. Brf.* at 11. Thus, the economic loss doctrine bars Plaintiffs' tort claims relating to the quality or nature of the fertilizer as delivered, absent an allegation that Defendants' action fraudulently induced Plaintiffs to enter the contract.

On the other hand, claims based on allegations that customers purchased and relied on services precedent to their purchase of fertilizer appear to fall within the fraud in the inducement exception laid out in *Huron Tool*. As alleged, Huber relied on misrepresentations regarding the necessity and recommended quality of fertilizer in advance of their decision to purchase fertilizer. Defendants' representations were extraneous to the contract and allegedly induced Huber to enter into the contract. Despite incomplete factual development of the case at this juncture, the allegations

that CPS representatives made individualized representations after conducting soil analysis and other services that induced Huber to enter into a contract seem to fall squarely into the exception outlined in *Huron Tool*.  Unlike a customer that merely places an order with CPS, Huber purchased soil analysis services and relied on recommendations that were distinct from the later execution of the contract.  Thus, Huber's fraud claim alleging that CPS's services induced him into contracting is not barred by Michigan's interpretation of the economic loss doctrine.

Next, Plaintiffs allege that Defendants converted Plaintiffs' fertilizer before delivery by removing nutrients from the fertilizer and replacing it with the low grade Port Huron mixture. Though the Court recognizes the broad rationale behind the economic loss doctrine provides a sound basis to bar Plaintiffs' conversion claim, *Huron Tool* acknowledges that "[t]he viability of the doctrine in actions for intentional torts . . . remains an unaddressed issue in Michigan." *Huron Tool*, 532 N.W.2d at 543.  *Huron Tool* specifically addressed the application of the doctrine to the tort of fraud.  The *Huron Tool* court, however, recognized that the *Neibarger* holding was limited to unintentional torts and the court did not explicitly extend the doctrine to all intentional torts.  *Id.* Nevertheless, this Court concludes there are alternative legal grounds which require dismissal of the conversion cause of action.

Defendants moved to dismiss Plaintiffs' conversion claim on the grounds that title had not passed to Plaintiffs when the alleged conversion took place.  Generally, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." Mich. Comp. Laws § 440.2401(2).  Additionally, " if the contract requires delivery at destination, title passes on tender there." Mich. Comp. Laws § 440.2401(2)(b).  Parties to a contract are free to explicitly agree on  the manner in which title to goods passes from seller to

buyer.  Mich. Comp. Laws  § 440.2401(1).

Plaintiffs allege that title passed to them at the time they purchased the fertilizer from Defendants.  Plaintiffs do not assert any factual allegation of an agreement between the parties that title passed prior to delivery.  Plaintiffs' allegation that title passed before Defendants removed nutrients from the fertilizer is nothing more than a bare factual assertion.  Thus, Plaintiffs' conversion claim is appropriately barred by law.

Finally, Plaintiffs brought a civil conspiracy claim arising from the breach.  A claim of civil conspiracy "may not exist in the air; rather it is necessary to prove separate, actionable tort."  *Early Detection Center, P.C. v. New York Life Ins. Co.*, 157 Mich. App. 618, 631-32 (1987).  *See also Saloka v. Shelby Nursing Center Joint Venture*, 2005 WL 3304596, 8 (Mich. App. 2005) (Unreported); *Central Contracting, Inc. v. J.R. Heinman & Sons, Inc.*, 2004 WL 2624806, 5 (Mich. App. 2004) (Unreported).  Considering that Plaintiffs' claim based on fraudulent inducement survives the motion to dismiss, Plaintiffs can bring the civil conspiracy claim because they can yet advance a sustainable, underlying claim to support the civil conspiracy count.  Thus, Plaintiffs' civil conspiracy claim, to the extent based on a theory of fraud in the inducement, will not be dismissed for failure to state a claim.

IV

Accordingly, it is **ORDERED** that Defendants' motion to dismiss [dkt #20] is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiffs count II alleging fraud and count III alleging civil conspiracy are dismissed to the extent that Plaintiffs are advancing their claims based solely on the quality of the fertilizer.

It is further **ORDERED** that Defendants' motion to dismiss [dkt #20] is **GRANTED IN PART** with respect to the claim of conversion as to all Plaintiffs.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 19, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 19, 2007.

s/Tracy A. Jacobs
TRACY A. JACOBS